IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MELISSA JOYCE SHEPPARD      :     CIVIL ACTION
                                 :
             v.                  :
                                 :
ANDREW SAUL, Commissioner of    :     NO.  18-4633
Social Security[1]                         :

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                 October 31, 2019

      Melissa Joyce Sheppard ("Plaintiff") seeks review of the Commissioner's decision denying her claim for disability insurance benefits ("DIB").  I conclude that the decision of the Administrative Law Judge ("ALJ") denying benefits is supported by substantial evidence and will affirm the Commissioner's decision.

## I.     **PROCEDURAL HISTORY**

      Plaintiff protectively filed for DIB on July 13, 2015, claiming that she became disabled on April 1, 2013, due to migraine headaches, chronic obstructive pulmonary disease ("COPD"), dizziness, and leg and knee pain and swelling.  Tr. at 61, 119, 150.[2] The application was denied initially, id. 64-68, and Plaintiff requested an administrative hearing before an ALJ, id. at 70, which took place on May 10, 2017.  Id. at 27-51.  On

---

      [1]Andrew Saul became the Commissioner of Social Security ("Commissioner") on June 17, 2019, and should be substituted for the former Acting Commissioner, Nancy Berryhill, as the defendant in this action.  Fed. R. Civ. P. 25(d).

      [2]For DIB eligibility, a claimant must establish disability on or before her date last insured.  See 20 C.F.R. § 404.101(a); Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  Plaintiff's date last insured for purposes of DIB is June 30, 2017.  Tr. at 52.

September 19, 2017, the ALJ found that Plaintiff was not disabled. Id. at 11-21. The

Appeals Council denied Plaintiff's request for review on September 25, 2018, id. at 1-3,

making the ALJ's September 19, 2017 decision the final decision of the Commissioner.

20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on October 19, 2018. Doc. 1.

The matter is now fully briefed and ripe for review. Docs. 15-16.[3]

## II.  **LEGAL STANDARD**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantially gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment"
> that significantly limits her physical or mental ability to
> perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the
> impairment meets or equals the criteria of an impairment
> listed in the listing of impairments ("Listings"), 20 C.F.R. pt.
> 404, subpt. P, app. 1, which results in a presumption of
> disability;

---

[3]Defendant consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c), see Standing Order, In RE: Direct Assignment of Social Security Appeal
Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018), and I previously
concluded that Plaintiff is deemed to have consented based on her failure to file a consent
or declination following notice. Docs. 2, 5, 6.

4.	If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.	If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled and is capable of performing jobs that exist in significant

numbers in the national economy.  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," and must be "more

than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399

F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck,

181 F.3d at 431.

## III.  DISCUSSION

### A.  ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from three severe impairments at the second step of the sequential evaluation; migraines, degenerative joint disease of the right knee, and obesity.  Tr. at 13.  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 15, and that Plaintiff retained the RFC to perform light work except she is limited to no climbing of ladders, ropes, or scaffolds; no kneeling or crawling; no more than occasionally performing all other postural maneuvers; no exposure to hazards such as unprotected heights or moving mechanical parts; no outdoor work; no bright or flickering lights such as those found in metal-cutting or welding; and no more than moderate noise.  Id. at 16.  At the fourth step of the evaluation, the ALJ found that Plaintiff could perform her past relevant work as a medical assistant.  Id. at 19.  In the alternative, the ALJ found at step five that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform.  Id. at 20.

Plaintiff claims that the ALJ (1) failed to properly consider the opinions of her treating neurologists, (2) mischaracterized the evidence of record, (3) erred in discrediting Plaintiff's testimony, and (4) failed to properly utilize Vocational Expert ("VE") testimony.  Doc. 15 at 5-13.  Defendant responds that the ALJ properly considered the medical opinions, Plaintiff's testimony, and the VE testimony, and argues that substantial evidence supports the ALJ's decision.  Doc. 16 at 6-14

B. **Summary of Medical Evidence**

The record references Plaintiff's treatment for various physical ailments, and I will summarize these first before turning to her primary complaint of migraines. Her history includes plantar fasciitis of the left foot, chest pain, vertigo, and back pain and spasm. Tr. at 228, 263, 264, 433 442.[4] Plaintiff began experiencing right knee pain after a fall in August 2014. Id. at 228, 248, 377. Orthopedist George Stollsteimer, M.D., diagnosed Plaintiff with meniscal tears, a subchondral cyst,[5] subchrondal edema,[6] and degenerative joint disease of the right knee, for which she underwent arthroscopy[7] with partial meniscectomy and chondroplasty[8] on January 2, 2015. Id. at 308, 368, 377-78. After the surgery, Plaintiff underwent several injections for continued pain. Id. at 358, 360

---

[4]The records also reference Plaintiff's weight. Plaintiff is five feet, seven inches tall and her weight ranged from approximately 190 to 230 pounds. E.g., tr. at 263, 267.

[5]A subchondral cyst is "a simple bone cyst within the fused epiphysis beneath the articular plate; it is lined with a membrane that contains a mucinous material." Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 460.

[6]Subchondral edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." DIMD at 593.

[7]Arthroscopy refers to the "examination of the interior of a joint with an arthroscope," which is an instrument used for such examination and for carrying out diagnostic and therapeutic procedures within the joint. DIMD at 158, 620.

[8]Meniscectomy is "excision of an intra-articular meniscus, as in the knee joint." DIMD at 1134. Chondroplasty is "plastic surgery on cartilage; repair of lacerated or displaced cartilage." Id. at 353.

(2/24/15 – Depo-Medrol injection), 336, 338 (5/7/15 – Orthovisc injection), 330, 333

(5/21/15 – Orthovisc injection), 319, 324, 326 (7/9/15 – lidocaine injection).[9]

In the same fall, Plaintiff also injured her left hindfoot.  Tr. at 354.  An MRI

revealed posterior tibial tendinitis and tenosynovitis,[10] for which Andre Pagiaro, M.D.,

performed Carbocaine and Depo-Medrol injection[11] on March 25, 2015.  Id. at 351, 355.

On October 23, 2015, Dr. Stollsteimer performed a right knee iliotibial band

resection due to continued pain in the lateral aspect of the knee.[12]  Id. at 410, 491.  Two

months after the surgery, Plaintiff twisted her knee and complained of increased pain in

the knee.  Id. at 490.  In January 2016, Plaintiff again fell, landing on her right knee.  Id.

at 488.  When she saw Dr. Stollsteimer on January 13, she was complaining of increased

---

[9]Depo-Medrol is a steroid used to treat many inflammatory conditions including arthritis, lupus, psoriasis, ulcerative colitis, allergic disorders, and conditions that affect the skin, eyes, lungs, stomach, nervous system, or blood cells.  See https://www.drugs.com/mtm/depo-medrol-injection.html (last visited Oct. 21, 2019).  Orthovisc is similar to the fluid that surrounds the joints of the body and acts as a lubricant and shock absorber for the joints.  It is used to treat knee pain caused by osteoarthritis.  See https://www.drugs.com/orthovisc.html (last visited Oct. 21, 2019).  Lidocaine is a local anesthetic used to numb an area of the body to help reduce pain or discomfort.  See https://www.drugs.com/mtm/lidocaine-injection.html (last visited Oct. 21, 2019).

[10]Tendinitis is "inflammation of tendons and of tendon-muscle attachments." DIMD at 1881.  Tenosynovitis is "inflammation of a tendon sheath."  Id. at 1882.

[11]Carbocaine is a drug used to numb an area before a procedure.  See https://www.drugs.com/cdi/carbocaine.html (last visited Oct. 21, 2019).

[12]The iliotibial band also called the tractus iliotibialis is "a thickened longitudinal band of fascia lata extending from the tensor muscle downward along the lateral side of the thigh to the lateral condyle of the tibia."  DIMD, at 1949.  A resection is the removal of part or all of an organ or tissue.  Id. at 1626.

pain in the right knee and pain in the right ankle and left foot.  Id.  X-rays of the knee, ankle, and foot were unremarkable.  Id.  The doctor prescribed a Medrol Dosepak.[13]  Id. at 489.  Dr. Stollsteimer ordered an MR arthrogram to evaluate the meniscus for a re-tear or worsening arthritic symptoms, id. at 487, which revealed no evidence of a meniscal retear.  Id. at 485.

On February 25, 2016, Dr. Stollsteimer noted that Plaintiff "may be . . . dealing with the lateral patellofemoral [degenerative joint disease]," and referred Plaintiff for further evaluation of possible patellofemoral replacement.  Tr. at 483-84.  Following an examination on March 24, 2016, John Avallone, D.O., planned to do a diagnostic arthroscopy.  Id. at 479-80.  During the surgery on June 14, 2016, Dr. Avallone found a large tear of the lateral meniscus and arthritic changes in the lateral compartment and patellofemoral joint, and performed a lateral meniscectomy and arthroscopic debridement.  Id. at 475-77, 478.

At an August 8, 2016 follow up, Plaintiff complained of pain in her right Achilles tendon.  Tr. at 474.  Dr. Avallone ordered an MRI of her foot and prescribed Medrol Dosepak.  Id.  After reviewing the MRI on September 2, 2016, Dr. Avallone diagnosed Plaintiff with chronic tendinitis of the Achilles, and noted bilateral peripheral lower extremity edema for which he recommended she consult with her cardiologist or primary care physician.  Id. at 472.

---

[13]Medrol Dosepak is a form of Medrol previously defined.  See https://www.drugs.com/mtm/medrol-dosepak.html (last visited Oct. 21, 2019).

Plaintiff's primary complaint during the relevant period -- and the focus of this appeal -- involve her migraine headaches. Tr. at 31. In February 2014, Plaintiff complained to Mark Liebreich, M.D., her primary care physician, of dizziness, double vision, and headaches for the prior four weeks. Id. at 257.[14] Dr. Liebreich noted a history of pituitary adenoma.[15] Id. In September 2014, Dr. Liebreich noted that a neurosurgical evaluation concluded that the "pituitary microadenoma was not an issue and needed only yearly MRI follow-up," yet Plaintiff continued to suffer with vision loss, confusion, headaches, and dizziness. Id. at 252.

Neurologist James Gaul, M.D., began treating Plaintiff on March 31, 2015. Tr. at 402. She described episodes of dizziness, sometimes causing her to fall (including a fall causing injury to her right knee). Id. "With and without the vertigo she gets recurrent headaches described as a generalized vertex pain with generalized spread, with pulsatile components and visual blurring, at times diplopia." Id. At the time, Plaintiff's medications included Lyrica, Klonopin, Lexapro, Ambien, Dexilant, Voltaren, Percocet,

---

[14]At the hearing, Plaintiff testified that she started having migraines in 2011, which intensified in frequency and intensity after sinus surgery in 2014. Tr. at 38, 44-45; see also id. at 500 (Plaintiff report to neurologist that migraines began in November 2011).

[15]Pituitary adenoma is "a benign neoplasm of the anterior pituitary gland, some contain hormone-secreting cells, but some are not secretory." DIMD at 29.

and Symbicort.[16]  Id.  Dr. Gaul suspected migraines, prescribed a trial of Topamax,[17] and

ordered cerebral electrophysiologic studies.  Id. at 403.  In June, Plaintiff reported that

she was intolerant of and stopped Topamax, and Dr. Gaul noted that her cerebral

electrophysiologic studies were normal and started her on Inderal.[18]  Id. at 399.  In

August 2015, Plaintiff reported no improvement with Inderal for the headaches, which

occurred three or four times a week, and Dr. Gaul increased the dosage of Inderal.  Id. at

398.  Prior to her October 13, 2015 follow up, Dr. Gaul again increased the dosage of

---

[16]Lyrica is an anticonvulsant used to treat pain caused by fibromyalgia, or nerve pain with diabetes, herpes zoster, or spinal cord injury.  See https://www.drugs.com/lyrica.html (last visited oct. 21, 2019).  Klonopin is a benzodiazepine used to treat seizure disorder and panic disorder.  See https://www.drugs.com/klonopin.html (last visited Oct. 21, 2019).  Lexapro is an antidepressant.  See https://www.drugs.com/lexapro.html (last visited Oct. 21, 2019). Ambien is a sedative used to treat insomnia.  See https://www.drugs.com/ambien.html (last visited Oct. 21, 2019).  Dexilant is a proton pump inhibitor used to treat heartburn caused by gastroesophageal reflux disease.  See https://www.drugs.com/mtm/dexilant.html (last visited Oct. 21, 2019).  Voltaren is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain, or signs and symptoms of osteoarthritis or rheumatoid arthritis.  See https://www.drugs.com/voltaren.html (last visited Oct. 21, 2019).  Percocet contains a combination of oxycodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone.  See https://www.drugs.com/percocet.html (last visited Oct. 21, 2019).  Symbicort contains a combination of budesonide, a corticosteroid that reduces inflammation, and formoterol, a long-acting bronchodilator.  It is used to control and prevent the symptoms of asthma and COPD.  See https://www.drugs.com/symbicort.html (last visited Oct. 21, 2019).

[17]Topamax is an anticonvulsant used to prevent migraine headaches.  See https://www.drugs.com/topamax.html (last visited Oct. 21, 2019).

[18]Inderal (generic propranolol) is a beta blocker used to treat tremors, angina, hypertension, and to reduce the severity and frequency of migraine headaches.  See https://www.drugs.com/inderal.html (last visited Oct. 21, 2019).

Inderal, and at the appointment, he added imipramine[19] to her regimen.  Id. at 397.  In December, with no change in Plaintiff's headaches and dizziness, the doctor increased Plaintiff's imipramine.  Id. at 429.  On March 22, 2016, with no significant change in Plaintiff's headaches, the doctor again increased her dosage of Inderal.  Id. at 428.

On October 21, 2016, Plaintiff began treating with Rene Gomez, M.D., of Lawrenceville Neurology Center.  Tr. at 500.  Plaintiff reported having headaches two or more times per week that she rated an 8/10, with photophonophobia, visual disturbance, significant incapacitation and nausea/vomiting.  Id.  Dr. Gomez diagnosed migraines without aura, described as high frequency with significant disability, recommended a psychiatry consultation to assess her medication needs such as Effexor, and directed that she taper off imipramine, continue on Inderal, stop using oxycodone, and take Imitrex.[20] Id. at 501.  At Plaintiff's November 28, 2016 follow up, Dr. Gomez noted that Plaintiff had stopped imipramine and propranolol, needed to stop Tylenol and oxycodone completely, and had not followed up with psychiatry.  Id. at 498-99.  The doctor prescribed Depacon,[21] continued Imitrex, and again recommended that she have a psychiatry consultation to determine what medications she needed.  Id. at 499.

---

[19]Imipramine is an antidepressant.  See https://www.drugs.com/mtm/imipramine.html (last visited Oct. 21, 2019).

[20]Effexor is an antidepressant.  See https://www.drugs.com/effexor.html (last visited Oct. 21, 2019).  Imitrex is a headache medicine that narrows blood vessels around the brain used to treat migraine headaches in adults.  It does not prevent or reduce the number of attacks.  See https://www.drugs.com/imitrex.html (last visited Oct. 21, 2019).

[21]Depacon is used to treat seizures and has been discontinued in the United States. See https://www.drugs.com/cdi/depacon.html (last visited Oct. 21, 2019).

At Plaintiff's January 10, 2017 follow up visit, Dr. Gomez indicated that Imitrex did not relieve Plaintiff's migraine pain. <u>Tr.</u> at 496. The doctor recommended that she taper off Lexapro and start Effexor, Botox injections, and Maxalt.[22] <u>Id.</u> at 497. The following month, Plaintiff complained of nearly daily headaches, but had not started Botox. <u>Id.</u> at 494. On April 3, 2017, Dr. Gomez noted that Plaintiff "started Botox and has had a great response," but noted that she "needs better abortive treatment." <u>Id.</u> at 493. The doctor indicated that Plaintiff had only three headaches since starting Botox, but that Maxalt did not work for her. <u>Id.</u> at 492.[23]

Daniel Goldman, M.D., conducted a consultative examination on November 25, 2015. <u>Tr.</u> at 413-16. The doctor diagnosed plaintiff with COPD, right knee pain and "[q]uestion migraine headaches." <u>Id.</u> at 416. He found that Plaintiff could continuously lift and carry up to 20 pounds, frequently lift and carry up to 50 pounds, and occasionally lift up to 100 pounds. <u>Id.</u> at 417. He found she could sit, stand, and walk for 8 hours each in a work day, noting that she could stand for 7 hours at a time and walk for 6 hours at a time. <u>Id.</u> at 418. He found she had no limitation in her ability to use her hands and feet, and could frequently climb stairs and ramps, ladders and scaffolds, stoop, kneel,

---

[22]Botox is made from botulinum toxin, which blocks nerve activity in the muscles. It is used for a variety of conditions, including prevention of chronic migraine headaches. <u>See</u> https://www.drugs.com/botox.html (last visited Oct. 21, 2019). Maxalt is a headache medicine that narrows the blood vessels around the brain, used to treat migraine headaches. <u>See</u> https://www.drugs.com/maxalt.html (last visited Oct. 21, 2019).

[23]It is unclear when exactly Plaintiff began the Botox treatment. At her appointment with Dr. Gomez on February 17, 217, she was directed to start Botox treatment "soon," and return six weeks after beginning Botox treatment. <u>Tr.</u> at 495.

crouch, and crawl, and could continuously balance.  Id. at 420.  He found no limitation in the range of motion of any of her joints.  Id. at 423-26.

**C.    Other Evidence**

Plaintiff was born on March 23, 1968.  Tr. at 119.  She completed the eleventh grade and has past relevant work as a chiropractic assistant and medical assistant.  Id. at 34, 151.  Plaintiff testified that she had an attendance problem at work due to her migraines.  Id. at 35.[24]

Plaintiff explained that she knows when she is getting a migraine because it begins with dizziness and then nausea, followed by the migraine pain, during which all she wants to do is be in bed in a dark room and sleep.  Tr. at 38.  The Botox injections that Plaintiff began in February 2017 provided some relief, but she testified that she still got migraines two or three times a week.  Id.  At the time of the hearing in May 2017, Plaintiff was due for another round of Botox injections and explained that the migraines were "extremely bad" at that point.  Id.  The headaches would last for six hours to several days.  Id. at 39.

Plaintiff also testified that she has had issues with falling when she has headaches.  In August of 2015, Plaintiff got dizzy and fell and tore the meniscus of her right knee, for which she required surgery.  Id. at 40-41.  Plaintiff also testified that she does not sleep at night, but only sleeps when she has a migraine.  Id. at 42-43.

---

[24]Plaintiff stopped working as a medical assistant in 2011 due to attendance problems caused by her migraines.  Tr. at 35.  In 2013, she returned to the workforce, working for Lowes, an EMT practice, and an orthopedic practice, but her return was short-lived due to attendance problems caused by her migraines.  Id. at 36.

A Vocational Expert ("VE") testified at the administrative hearing, classifying Plaintiff's prior work as a medical assistant as skilled and light. Tr. at 47. The ALJ asked the VE to consider if someone of Plaintiff's age, education, and past relevant work, who was able to perform light work; with occasional postural maneuvers except climbing ladders, ropes, or scaffolds; no kneeling or crawling; no exposure to hazards or dangerous machinery; no outdoor work; no bright or flickering lights such as are found in metal cutting or welding; and no more than moderate noise. Id. at 48. The VE testified that such a person could perform Plaintiff's past work as a medical assistant. Id. Additionally, the VE testified that such a person could perform the jobs of survey worker, ticketer, and mold maker helper. Id. at 48. With respect to absences, the ALJ said that one or two absences per month (combining planned and unplanned absences) is acceptable, but three or more is not, and two unplanned absences per month is not acceptable. Id. at 49-50.

### D.  **Consideration of Plaintiff's Claims**

#### 1.  Consideration of Medical Evidence in the Record

In her first two claims, Plaintiff alleges that the ALJ failed to properly consider medical opinion evidence in the record and selectively interpreted the medical evidence from Plaintiff's treating neurologists. Doc. 15 at 6-8. Plaintiff first argues that the ALJ failed to accord proper weight to the opinions of Drs. Gaul and Gomez, Plaintiff's treating neurologists, that Plaintiff suffered from "significant, disabling migraines despite the use of various treatment regiments [sic] for her condition." Id. at 6-7. Plaintiff focuses special attention on the ALJ's statement that "[t]he record contains no opinions

from treating providers, so I rely upon the medical evidence and statements from [Plaintiff] in concluding the above [RFC]," tr. at 19, contending that "[t]he ALJ's blanket conclusion here is nothing but a disregard of both of Plaintiff's treating neurologists, Dr. Gaul and Dr. Gomez . . . ." Doc. 15 at 6. Defendant responds that the ALJ properly considered the doctors' clinical findings as they related to Plaintiff's functioning, and that they made only limited mention of disability in their reports which are not entitled to any deference because the question of disability is reserved for the Commissioner. Doc. 16 at 8-12.

First, I note there is no RFC assessment or other type of formal functional assessment from any treating physician in the record. Plaintiff contends that the ALJ disregarded opinions that Plaintiff was disabled contained in the treatment notes from Drs. Gaul and Gomez. However, the examples cited by Plaintiff are merely statements of her symptomatology or complaints given by Plaintiff. For example, Plaintiff relies on Dr. Gaul's March 31, 2015 notation that "[w]ith and without the vertigo she gets recurrent headaches described as a generalized vertex pain with generalized spread, with pulsatile components and visual blurring, at times diplopia." Doc. 15 at 6 (citing tr. at 402). Read in context, this is part of the doctor's listing of Plaintiff's complaints as the doctor earlier in the paragraph stated that Plaintiff "presents with a number of complaints." Tr. at 402. Rather than these symptoms "being attributable to her migraine headaches," Doc. 15 at 7, the doctor's impression is that "[d]izziness, falling, headaches and visual changes are of uncertain etiology." Tr. at 403. In Dr. Gaul's most recent treatment note of October 13,

2015, he referred to Plaintiff's headaches and dizziness as "neurologic complaints" made by Plaintiff.  Id. at 397.

Similarly, at Plaintiff's first visit to Dr. Gomez on October 16, 2016, the doctor noted that Plaintiff "has "high frequency and significant disability."  Tr. at 501. However, the "Data Reviewed" section of the treatment notes indicates that the only testing that the doctor reviewed was two forms asking Plaintiff to describe her symptoms and their impact on her functioning, called the Headache Impact Test ("HIT-6") and the Migraine Disability Assessment Test ("MIDAS").  Id.; see also id. at 502-03 (HIT-6), 504 (MIDAS).  Based on her self-report, Plaintiff scored high on these measures, for example scoring in the "severe disability" range of the MIDAS.  Id. at 504.  Because these reflect Plaintiff's assessment of her limitations rather than the doctor's, the forms do not constitute medical opinions.  "The mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."  Thompson v. Berryhill, Civ. No. 15-3506, 2017 WL 2986330, at *5 (E.D. Pa. July 12, 2017) (quoting Morrison v. Barnhart, 78 F. App'x 820, 824 (3d Cir. 2003)).

Review of Dr. Gomez's treatment notes from October 21, 2016 through April 3, 2017, reveals that the doctor found that Plaintiff suffered from migraines, "but with a component of medication overuse headache," tr. at 499, and that once Plaintiff stopped taking oxycodone, Tylenol, and Lexapro, and began Botox injections, she had "a great response."  Id. at 492-93.  Specifically, the doctor wrote on April 3, 2017:  "Since her visit here on 2/7/17, she has started Botox and has improved a lot, only three headaches, a 5/10, improves with caffeine."  Id. at 492.

15

Moreover, to the extent the notations of disability in the medical records could be considered opinions, such opinions would not be dispositive of the issue. "An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved for the Commissioner." Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 148 (3d Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)).

Plaintiff also alleges that the ALJ selectively interpreted the medical evidence from the treating neurologists. Doc. 15 at 7-8. Defendant responds that the ALJ relied on the clinical findings relating to functioning and the objective testing in formulating her RFC assessment. Doc. 16 at 10-12.

Here, the ALJ discussed the treatment records from Drs. Gaul and Gomez in formulating Plaintiff's RFC assessment.

> In terms of [Plaintiff's] alleged migraines, the record reflects a history of symptoms including headaches with dizziness and vertigo. [Plaintiff] sought treatment with neurologist Dr. James Gaul in 2015 and 2016. Despite her several neurological complaints, her examinations were fairly unremarkable. She had difficulty with tandem walking and walked with a slight waver after a period of time, but her Romberg sign[25] was normal. She has sluggish reflexes and diminished vibration sensation on the left side of her body, but she had an unremarkable motor examination. A March 2015 brain MRI showed only a stable lesion thought to be a pituitary microadenoma. Dr. Gaul stated the dizziness and headaches may represent a migraine event, and [Plaintiff] began Topamax. An April 2015 EEG was normal, as was testing on visual evoked response. [Plaintiff] was switched to

_____

[25]Romberg Sign is the "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense . . . ." DIMD at 1715.

Inderal when she when she complained of side effects from Topamax.  In June 2015, [Plaintiff] reported episodes of feeling "out of it," and Dr. Gaul reviewed the potential for medication toxicity noting her combination of Lyrica, Klonopin, and Lexapro prescribed elsewhere.  From June 2015 through March 2016, Dr. Gaul titrated her dose of Inderal as she continued to complain of headaches.  The record indicates no treatment for [Plaintiff's] headaches between March 2016 and October 2016, when she began treatment with neurologist Dr. Rene Gomez.  There, she reported two or more migraines each week with photophonophobia, visual disturbance, and nausea.  Her neurological examination was normal, and Dr. Gomez assessed migraines without aura, not intractable.  It was recommended she seek a psychiatric consultation to clarify any psychiatric disorder and determine "what she really needs in terms of medications."  However, records indicate no psychiatric consultations or treatment.  Dr. Gomez recommended several medication combinations as well as the elimination of Tylenol and oxycodone before determining [Plaintiff] was a candidate for Botox injections in January 2017.  As noted, her follow-up visit on April 3, 2017 indicated only three headaches at 5/10 pain since her Botox treatment in February 2017.  ([Tr. at 492]).

Id. at 17-18.

Review of the record reveals that the ALJ accurately portrayed the medical evidence regarding Plaintiff's neurological treatment.  The objective testing, including an EEG and visual evoked response, were normal.  Tr. at 399, 400, 401.[26]  On August 24, 2015, Dr. Gaul found "no neurologic findings" on examination, id. at 398, and the

---

[26]Plaintiff argues that the ALJ's reliance on the objective medical testing results was inappropriate because "[i]t is well established . . . that people who suffer from migraine headaches do not ordinarily show any abnormalities on an MRI or CAT scan."  Doc. 15 at 9.  I note that the negative objective test results (MRI, EEG, and visual evoked response) were only one of many factors the ALJ considered in the neurologists' reports in formulating Plaintiff's RFC assessment.

neurologic abnormalities he found in other examinations were noted by the ALJ. Id. at 399 (June 26, 2015 - sluggish reflexes), 402 (March 31, 2015 – sluggish reflexes, tandem walking difficulty, waver to the left with longer walking). The ALJ noted abnormalities where appropriate, including the MRI showing a stable pituitary microadenoma. Id. at 399. Likewise, the ALJ noted that Dr. Gomez's neurological examinations were normal. Id. at 495, 497, 499. The ALJ also noted that the record indicates that Plaintiff did not seek any treatment for her headaches from March 2016 to October 2016. Id. at 17; see also id. at 428 (March 22, 2016 – last treatment record from Dr. Gaul); 500 (Oct. 21, 2016 – initial consultation with Dr. Gomez).

Contrary to Plaintiff's assertion that the ALJ selectively interpreted the medical evidence, the ALJ did exactly what is required, "[s]urveying the medical evidence to craft an RFC." Titterington v. Barnhart, 184 F. App'x 6, 11 (3d Cir. 2006). I find no error in the ALJ's consideration of the medical record.

### 2. Consideration of Plaintiff's Testimony

Plaintiff next complains that the ALJ erred in discrediting Plaintiff's testimony. Doc. 15 at 8-10. Defendant responds that the ALJ properly considered Plaintiff's testimony by considering the medical evidence, Plaintiff's treatment course, the effectiveness of her treatment, and her daily activities. Doc. 16 at 12-14.

Social Security Regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and (2) an evaluation of the intensity and persistence of the pain or symptoms and the extent

18

to which it affects the individual's ability to work. 20 C.F.R. § 404.1529(b), (c); see also S.S.R. 16-3p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2017 WL 5180304 (applicable March 28, 2016).[27] In determining the intensity, persistence, and limiting effects of a claimant's symptoms, the Administration is required to consider medical history, the signs and laboratory findings, and statements from the claimant or other persons about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(c)(1). In addition, the factors relevant to the evaluation of symptoms include daily activities, location, duration, frequency, and intensity of symptoms, precipitating and aggravating factors, the type, dosage, and effectiveness of medication, and treatment other than medication used to treat the symptoms. Id. § 404.1529(c)(3).

Here, the ALJ concluded that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. at 17. After discussing the evidence in the neurologists' reports, as quoted in the earlier section of this memorandum, the ALJ further considered Plaintiff's complaints regarding the limitations imposed by her headaches.

> Despite [Plaintiff's] allegations of disabling headaches
> multiple times a week, she has been able to maintain her

---

[27]SSR 16-3p addresses the evaluation of symptoms in disability claims and rescinds the prior version of the Ruling, SSR 96-7p, by eliminating the use of the word "credibility." Because it was in effect at the time of the ALJ's decision, I will rely on SSR 16-3p in this discussion.

personal care and engage in activities of daily living. She reports being able to drive, shop in stores for food, perform some housework, cook meals, handle money, watch television and use the computer ([Tr. at 160-69, 32-46]). [Plaintiff] has not required hospitalization for her headaches; despite suffering from a several days-long migraine at her hearing, worsened by the lights in the hearing room, she was able to testify coherently and at some length. ([Id. at 32-46]). Therefore, I find [Plaintiff's] allegations are not entirely consistent with the medical evidence. While [Plaintiff] suffers from migraine headaches, she gained relief after engaging in consistent neurological treatment and complying with medication recommendations. ([Id. at 492-505]). Further, [Plaintiff's] abilities to engage in activities of daily living despite her migraines supports the conclusion that she is adequately accommodated by work that is indoors with no bright or flickering lights and no more than moderate noise. To the extent [Plaintiff] suffers any associated dizziness, she is also restricted to light work with no ladders, ropes, or scaffolds, and no exposure to hazards.

Id. at 18.

Review of the entire decision establishes that the ALJ considered Plaintiff's medications and their effectiveness, and crafted the RFC assessment to limit any exposure to aggravating factors including noise, flickering lights, and circumstances where her dizziness could pose a risk. Despite Plaintiff's testimony at the hearing that she continues to have migraines two or three times a week even with the Botox treatment, tr. at 38, she reported to Dr. Gomez that she had only had three headaches in a six week period after starting Botox and that they were a 5/10 on a pain scale instead of the 8/10 she reported when she first began treatment with Dr. Gomez. Id. at 492-93, 500. Although Plaintiff takes issue with the ALJ's characterization of Plaintiff's daily activities, Doc. 15 at 9-10, Plaintiff stated in her Function Report that she can prepare

simple easy meals, does some cleaning and laundry, shops once or twice a month, and is able to handle money and the checkbook.  Tr. at 163-64.  I decline to reweigh the evidence, and find no error in the ALJ's consideration of Plaintiff's complaints.

    3.    VE Testimony

Finally, Plaintiff contends that the ALJ failed to properly utilize the VE's testimony.  Doc. 15 at 10.  Defendant responds that the ALJ properly considered the VE's testimony.  Doc. 16 at 14.

In order for vocational testimony to provide substantial evidence for the ALJ's determination that a claimant can perform certain jobs, the hypothetical posed to the VE must accurately portray the claimant's impairments that are supported by the record. Money v. Barnhart, 91 F. App'x 210, 213 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).  "Hypotheticals are considered deficient when important factors are omitted or the claimant's limitations are not adequately portrayed."  Emery v. Astrue, Civ. No. 07-2482, 2008 WL 5272454, at *3 (E.D. Pa. Dec. 18, 2008) (Robreno, J.) (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).

Here, Plaintiff focuses on the questioning involving absenteeism.  Specifically, Plaintiff argues that the ALJ ignored the frequency, intensity, and unpredictability of Plaintiff's migraines in failing to find Plaintiff disabled.  Doc. 15 at 11.  At the hearing, the VE testified that one or two absences a month, combining planned and unplanned absences, is acceptable, but that two unplanned absences every month would be

unacceptable.  Tr. at 49, 50.  Based on this testimony, Plaintiff contends that she should have been found disabled based on absenteeism.  Doc. 15 at 11.

Plaintiff's argument ignores the fact that the ALJ did not limit Plaintiff to jobs that would allow multiple unplanned absences each month.  As discussed earlier, the ALJ relied on Dr. Gomez's notes indicating that, once Plaintiff began Botox treatment, her complaints of migraines diminished in both frequency and intensity.  Tr. at 18, 492-93.  Thus, I find no error in the ALJ's analysis.

IV.    **CONCLUSION**

The ALJ's decision is supported by substantial evidence.  She properly considered the records submitted by Plaintiff's treating neurologists and the "opinions" of disability therein were merely notations of her complaints.  The ALJ also properly considered Plaintiff's complaints in light of the medical record, Plaintiff's treatment, response to treatment and activities, and the VE testimony.  Accordingly, I will affirm the Commissioner's final decision denying DIB.

An appropriate Order follows.